## General Management Corporation, Petitioner, v. Commissioner of Internal Revenue, Respondent.

Docket No. 106487.    Promulgated March 24, 1942.

*Harry Thom, Esq.*, and *B. A. Ragir, Esq.*, for the petitioner.
*G. W. Brooks, Esq.*, for the respondent.

742

## OPINION.

ARUNDELL: The only issue before us is whether or not petitioner was a personal holding company in the taxable year within the purview of section 402 of the Revenue Act of 1938.[1] Another issue

---

[1] SEC. 402. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this title, and Title I, the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 403; but if the corporation is a personal holding company with respect to any taxable year beginning after December 31, 1936, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum, until a taxable year during the whole of the last half of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 70 per centum of the gross income is personal holding company income; and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

\*        \*        \*        \*        \*        \*        \*

relating to the deduction of personal property taxes, which was raised by the pleadings, was abandoned by petitioner at the hearing.

There is no dispute concerning the ownership of stock of petitioner. During the taxable year petitioner's entire outstanding stock was owned by three individuals. The stock ownership requirement of section 402 (a) is therefore met and petitioner must be deemed to be a personal holding company unless it has proved that less than the statutory percentage of its gross income in the taxable year was personal holding company income. It is clear that if 80 percent of petitioner's gross income consists of personal holding company income, petitioner is a personal holding company.

The amount of petitioner's gross income for the taxable year has been vigorously disputed by petitioner and respondent. Respondent contends that the sum of $48,162.31, the amount shown as gross income on petitioner's income and excess profits tax return for the taxable year, is the gross income of petitioner for the taxable year. Petitioner argues that the amount reported on the return must be increased by certain amounts which petitioner erroneously excluded from gross income. We have found as a fact that petitioner's gross income for the taxable year aggregated $60,839.43. Petitioner claims that two of the items comprising the gross income of petitioner, namely, the sum of $24,000 accrued under the United contract and the sum of $10,398.42 accrued under the Magill contract, were not personal holding company income as defined by section 403 of the Revenue Act of 1938. Respondent argues that these amounts were received from personal service contracts as defined by section 403 (e) of the Revenue Act of 1938.[2] Since the sum of these two amounts exceeds 50 percent of petitioner's gross income for the taxable year, we shall examine each of these items to determine whether either comes within the statutory definition of personal holding company income.

We are of the opinion that the amounts accrued by petitioner for services rendered under the United contract constitute personal holding company income. Section 403 (e) provides that amounts received under contracts to furnish personal service are personal holding company income where some person other than the taxpayer corporation has the right to designate, by name or description, the individual

[2] (e) PERSONAL SERVICE CONTRACTS.—(1) Amounts received under a contract under which the corporation is to furnish personal services; if some person other than the corporation has the right to designate (by name or by description) the individual who is to perform the services, or if the individual who is to perform the services is designated (by name or by description) in the contract; and (2) amounts received from the sale or other disposition of such a contract. This subsection shall apply with respect to amounts received for services under a particular contract only if at some time during the taxable year 25 per centum or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for the individual who has performed, is to perform, or may be designated (by name or by description) as the one to perform, such services.

who is to perform the services or where the individual who is to perform the services is designated by name or description in the contract. This provision applies only where the individual who may be or is so designated owns 25 percent or more of the outstanding stock of the taxpayer corporation. Gillam owned more than 25 percent of the stock of petitioner and was specifically designated in the contract between petitioner and United, dated February 11, 1937, as a person to perform personal services. That contract provided that the compensation of $2,000 per month should include the services of Gillam as comptroller, that Gillam as comptroller should continue to supervise the fiscal operations of United, and that "In the event that the said Grant Gillam shall die or shall become incapacitated to such extent as to make it impossible for him to continue as Comptroller of the Corporation and the Company is within three months thereafter unable to supply an individual for Comptroller who is acceptable to the Corporation, this agreement may, at the option of the Corporation, be terminated."

While the contract provides that petitioner furnish monthly statements to United, prepare budgets, and submit suggestions for improvement of United's profit and financial position, the record leaves us in no doubt that the person for whose services United was paying so large a sum was Gillam. In spite of the testimony of the secretary-treasurer of petitioner to the effect that a large portion of the services furnished by petitioner was not performed by Gillam, we believe that his services were the important ones so far as United was concerned. Gillam, together with his sister, who was not active in petitioner's operation, owned 90 percent of petitioner's stock during the taxable year. He received a salary of $25,000 a year from petitioner, whereas the total of all other salaries paid by petitioner in the taxable year, including those paid to petitioner's other officers, was $12,520.94. The wide disparity between Gillam's and the others' salaries, the fact that Gillam's services as comptroller are specifically designated in the United contract, and the provision of the United contract allowing termination of the contract by United in the event of Gillam's death and the failure of petitioner to find another individual satisfactory to United, are clearly indicative that United entered into the contract so that it might receive Gillam's services. We hold that the United contract was a personal service contract within the meaning of section 403 (e) and that amounts accrued thereunder in the taxable year constitute personal holding company income.

The evidence as to the nature of the Magill contract leads us to the conclusion that the income received thereunder is not personal holding company income within the meaning of the statute. But the

determination of this point in petitioner's favor still leaves more than 80 percent in what the statute defines as personal holding company income. The items of interest in the sum of $1,091.57, capital gains in the sum of $14,931, dividends in the sum of $6,223, directors' fees in the sum of $450, and amounts received on final liquidation of the Chicago Armored Car Co. in the sum of $3,745.44 are of the types of personal holding company income enumerated in section 403 of the Revenue Act of 1938, and petitioner made no claim in its briefs to the contrary. The sum of these amounts and that received by petitioner under the United contract aggregates $50,441.01, or 82.85+ percent of the total gross income of petitioner. Petitioner, therefore, was a personal holding company in the taxable year.

Petitioner contends, however, that its gross income for the taxable year includes the sum of $3,417.59 which, it claims, constitutes reimbursement for services and facilities furnished by petitioner to the syndicate in accordance with an agreement between petitioner, the syndicate, and Earl Lowe. Petitioner argues that a reimbursement for the use of facilities has been held to be gross income by us in the cases of *Kresge Department Stores, Inc.*, 44 B. T. A. 1210, and *Andrew Jergens Co.*, 40 B. T. A. 868.

The record discloses that petitioner did not stand to gain, directly or indirectly, from the arrangement for Lowe's services. The agreement, the entries in petitioner's books, and the deduction of the syndicate's 76 percent of the consolidation expenses on the syndicate's 1938 return indicate that the traveling expenses, rent, salary, and financial expenses, aggregating $3,417.59, were the expenses of the syndicate. As the presiding Member indicated at the hearing, petitioner has attempted to rewrite its books in the light of the later knowledge that a deficiency has been determined. We are of the opinion that there is no justification for such rewriting. The manner in which the petitioner and the syndicate handled these entries would seem to be entirely consonant with the understanding of the parties. Mere advances partake of the nature of loans and the amounts received in reimbursement therefor are not includible in gross income. *Charles M. Howell, Administrator*, 21 B. T. A. 757. Indeed, if we had here the question of a tax on gross income, we doubt if anyone would seriously contend that the reimbursement of these items would fall within that category.

Nor do we think *Andrew Jergens Co.* and *Kresge Department Stores, Inc.*, *supra*, compel a contrary treatment. In the former case, Jergens' wholly owned subsidiary employed the parent company to manufacture various products in the plant of the parent company and with the latter's personnel. For this work it paid the amount agreed upon. It is true that the amount to be paid was based on an alloca-

tion of cost, but it nevertheless appeared that the payment was for the performance of work done by the Jergens Co. In the *Kresge* case the taxpayer corporation acted as a purchasing agent for various companies and in the performance thereof used its own staff and did the job in its own way. In each of the cited cases the fact that the taxpayer rendering the services was not directly to profit was not thought determinative. What the taxpayer received, however, was for services rendered by it. Moreover, in both the *Jergens* and *Kresge* cases it was found that the taxpayer received certain indirect benefits by their undertakings.

This does not appear to be true here. The profit was to go to the Gillam Syndicate and to Lowe and none was to go to petitioner. No doubt the reason that petitioner does not share in the profits is the fact that it performs none of the work on the so-called "consolidation deals." As substantially the same interests appear in the syndicate and in petitioner, if it had been desirable for petitioner to become a party to this particular work it would no doubt have been so arranged. But the parties have always been careful to keep the activities of the syndicate and those of petitioner separate. Thus it must remain.

Even should we accept petitioner's general theory that what we have here is a reimbursement of expenses that should be treated as gross income, it does not follow that such income is of a nonpersonal holding company type. Nine hundred and twelve dollars was for rent. Section 403 (g) of the Revenue Act of 1938 contains a new subsection which provides that rents, unless they constitute 50 percent or more of gross income, are personal holding company income. "Rents" for the purpose of section 403 (g) means "compensation, however designated, for the use of, or right to use, property * * *." Thus this part of the reimbursement only serves to increase petitioner's personal holding company income. A small item of $118.56 is listed without explanation other than the designation on the books "financial." We can not, in the circumstances here, on a rewriting of the books treat this small amount as not being personal holding company income. The sum of the amounts received under the Magill contract, $10,398.42 and $2,387.03 (the amount of $3,417.59 reduced by the amount of rent, $912, and the amount referred to as financial expense, $118.56) constitutes less than 20 percent of petitioner's gross income for the taxable year. Thus even should we treat the so-called reimbursement for salaries and expenses as income of a nonpersonal holding company character, it would be found by mathematical calculation that over 80 percent of petitioner's income falls within the statutory definition of personal holding company income.

Petitioner has not shown that its failure to file a personal holding company return was due to reasonable cause and not due to willful

neglect. Respondent's determination of a 25 percent penalty for petitioner's failure to file a personal holding company return is accordingly sustained.

It is never quite satisfactory to decide a case of this character without the testimony of the most important witness, namely, Gillam, or the testimony of officers of the companies with whom the petitioner made its contracts. In this case it was petitioner's burden. The testimony offered fails to satisfy us that less than 80 percent of petitioner's income was of a personal holding company nature as defined in the statute. It follows that respondent must be sustained.

*Decision will be entered under Rule 50.*